We'll hear argument first this morning in Case 23-411, Murthy v. Missouri. Mr. Fletcher. Thank you, Mr. Chief Justice, and may it please the Court. The government may not use coercive threats to suppress speech, but it is entitled to speak for itself by informing, persuading, or criticizing private speakers. Like Bantam Books, this case should be about that fundamental distinction between persuasion and coercion. But unlike Bantam and the case that you'll hear next, this is not a typical suit where a speaker challenges government actions affecting its own speech. Instead, two states and five individuals are trying to use the Article III courts to audit all of the Executive Branch's communications with and about social media platforms. That problem has infected every step of this case. Respondents don't have standing at all because they have not shown an imminent threat that the government will cause a platform to moderate their posts in particular. But the lower court still reviewed a vast range of speech by different officials to different platforms about different times without asking whether it had anything to do with respondents. And the courts then entered a universal injunction restricting speech about any content posted on any platform by anyone and binding thousands of officials, including presidential advisers speaking to the public and FBI agents trying to protect the nation from foreign threats. Even apart from the Article III problem, that injunction rests on two fundamental legal errors. First, the Fifth Circuit radically expanded the state action doctrine by holding that even concededly non-coercive communications, like the CDC's public health advice, can transform private platforms' editorial choices into state action. And second, the Fifth Circuit mistook persuasion for coercion. It held that the FBI's communications are inherently coercive because the FBI is a law enforcement agency, a theory that even respondents don't defend in this court. And it held that White House officials engaged in coercion because they use strong language or referred in a general way to legal reforms in response to press questions. If this court reaches the merits, it should reaffirm that government speech crosses the line into coercion only if, viewed objectively, it conveys a threat of adverse government action. And because no threats happened here, the court should reverse. I welcome the court's questions. Mr. Fletcher, is the coercion encouragement framework of Bantam Book the only way to look at this case? So I think there are two ways to look at this case. I think one of them is the coercion inquiry, which we think comes from Bantam Books. You can think of that as an aspect of state action because when private parties are compelled to act, as the court said in Halleck, they become state actors. We think that's the right way to think about this case. Respondents in the lower courts have also proposed a different way, the state action way. They've suggested that even absent coercion, the government speech, if it encourages, in some colloquial sense, private action, it can turn that private action into state action. Do we just, so I understand your argument, do we normally apply state action doctrine in cases involving the government or private parties? Both, I think. You know, in some state action cases, you're asking, someone is suing a private party and alleging that that private party is bound by the contours of the First Amendment or other constitutional provisions because they're state actors. You see some suits like that that look like this, suits against the platforms, suits against Stanford University, which was referenced in Tamika's brief here. But you also see suits against the government based on conduct by private parties. That was the case in Blum, and that's the theory that respondents are pursuing. Are there any First Amendment cases? Any First Amendment cases? I'm sorry. Using, employing state action doctrine. Often, and suing the government. Off the top of my head, I can't think of one. So they're usually things like Medicare or government contracts or relationships like that. Yeah, I think what that gets at is that it's very unusual, and we don't think it's possible for the government through speech alone to transform private speakers into state actors. We think these cases usually are and ought to be viewed through the Banton-Books type framework, where there's a problem if the government is engaged in coercion, but if it stays on the persuasion side of the line and all we're talking about is government speech, then there's no state action, and there's also no First Amendment problem. One final question. You continue to refer to government speech. Just for my edification, what's the constitutional basis for government speech? The court has said, I think that the government is entitled to speak for itself. It's not a right that comes from the First Amendment. It's a feature of our constitutional democracy. As the court has said, the government couldn't function if it couldn't express points of view. In Walker, the court explained, for example, that the government has to be able to run a vaccination campaign at times of public health crisis. I think that's a major part of what was going on here. So the court hasn't located it in any specific constitutional provision. It's just part of democratic governance. Explain to me, what exactly is the injunction doing? Meaning, how is it affecting your speech, the government's speech? There's a lot of defendants. There's a lot of agencies. I know that our case law says an injunction just can't tell you to violate the law, and so this injunction might have that problem inherent in it. But the Fifth Circuit injunction is what's before us, correct? Correct. And it says to encourage or significantly, to coerce, that's a legal term, or significantly encourage, and you're questioning what the meaning of significant encouragement is. And I'm not sure I know exactly what the Fifth Circuit meant, but we can figure that out. Let's just use, to coerce social media companies, to remove, delete, suppress, or reduce, including through altering their algorithms, posted social media content containing protected speech. How is that harming the government? I want some specifics. I'm happy to do that. I'll say first, just to be clear, because this court has stayed, the injunction, fortunately, it's not harming the government now, but there were times when Exactly, right. So I think the problem with that, we don't say that the government can coerce private speakers. That is prohibited by the First Amendment. But the problem with the Fifth Circuit's injunction saying don't coerce or significantly encourage is that it comes at the end of 80 pages of legal analysis holding that the government had done those things by, for example, when the FBI would send communications to the platforms saying, for your information, it has come to our attention that the following URLs or email addresses or other selectors are being used by malign foreign actors, like Russian intelligence operatives, to spread disinformation on your platforms. Do with it what you will. That, the Fifth Circuit held, is coercive because the FBI is a powerful law enforcement agency. And I think if the injunction were put in place, the FBI would have to think very hard about whether it could continue to do that. Similarly, I think both the Fifth Circuit and my friends have really said that the crux of what they claim was coercion here was what happened in July of 2021 when the Surgeon General, the White House Press Secretary, and the President himself made statements criticizing the platform's practices on misinformation and false statements about COVID vaccines and calling on them to do better. I think it's really troubling, the idea that those sorts of classic bully pulpits, exhortations, public statements, urging actors to behave in different ways might be deemed to violate the First Amendment. And I think if the injunction were to go into effect and the President or his senior advisors, the President isn't enjoined, but if his senior advisors, the Press Secretary or someone else wanted to talk to the public about other problems, like the circulation of anti-Semitic or Islamophobic content on the social media platforms, or the effects they might be having on children's mental health, or national security issues like the anti-Semitic Osama bin Laden letter that was trending on TikTok at the end of last year, as we referenced towards the end of our brief, I think all of those things could be done only under the shadow of the injunction. And that comes around to the other point that you made, which is that this injunction, especially right in light of the opinion that comes before it, is extremely vague. And I think having that sort of vague injunction with these contestable legal terms that have been interpreted very broadly as applied to past conduct, hanging over the heads of all of these government officials doing all of these things is a real problem. And I think especially so when you're talking about entering such an injunction at the behest of two states and five individual social media users, whose main complaints are about the moderation of posts about COVID-19 many years ago, that they haven't really even shown were traceable to the government to begin with, we think. And we certainly don't think that they've shown that they face the sort of imminent threat of future injury that's required to satisfy Article 3. Mr. Fletcher, let me follow up on that. If even one of the plaintiffs has standing, then we're required to get to the merits. So let me ask you about Ms. Hines. And as you just said, her Facebook personal account was restricted at the time when the complaint was filed, and that injury must be traceable to the actions of the government. So in the first part of that imminent threat of future injury, her Facebook personal account was restricted at the time when the complaint was filed. So why isn't that sufficient to show an imminent threat of future injury? Mr. Fletcher, I'm sorry to interrupt you, but I have a question on traceability. Mr. Fletcher, traceability is basically a question of causation, right? Agreed. All right. The district court found that the injury was traceable to the government's actions, and the Fifth Circuit accepted that finding, reviewed it, and accepted it. So that's two courts. We don't usually reverse findings of fact that have been endorsed by two lower courts, and you haven't attempted to show that that finding is clearly erroneous. So respectfully, Justice Alito, I disagree with that. I think that the Fifth Circuit and the district court applied to loose a notion of traceability. They didn't try to say this post or any post or any action against Ms. Hines was traceable to any action by the government. They did what the Red Brief calls a bird's-eye view of traceability. They said the government is talking to the platforms a lot, the platforms are doing moderation, and so we'll just assume that all of that moderation is traceable to the government. Well, do you think that it's necessary to identify a single government action and then trace it to a single consequence? Do you think that's required? No, but I think you have to trace some government action to some consequence of the value, and maybe I could just be specific about this, because we challenged this in our opening brief, and the Red Brief comes back at pages 19 to 21 and offers up what I take to be their best examples of traceable harm. And I invite you to go look at the pages of the record that they're citing, because often what you find is that they're citing moderation of their content that happened either before the challenged government actions to which they're referring, or long after. All right, I have looked at that. On the issue of causation, under Malhealthy, are they required to show anything more than the government's action was a motivating factor? I don't know the answer to that in all cases, and I'm reluctant to make sort of broad statements about what the traceability requirement demands in different circumstances. I will say here, we're not disputing that. We're saying that they haven't shown any causal connection between the... And no effect whatsoever. Right. But most of the lower courts were wrong on that. I think they were, because again, they did this blunderbuss approach where they said the government is talking to the platforms about moderation, and the platforms are moderating content, but the platforms were moderating this content long before the government was talking to them. They had powerful business incentives to do the same thing. The acts of moderation were consistent with the platform's own policies. And this is, I think, another telling fact. In those red brief examples that we talked about on pages 19 to 21, some of them involved platforms like LinkedIn that wasn't even the subject of the challenged White House and Surgeon General's office communications with the platforms. Do you think that there are any factual findings with respect to standing that we are required to give clear error review to? I think findings of historical fact, absolutely. We're not fighting back to the idea that pieces of content were moderated, that the government made certain statements. And if there had been findings that said Facebook deleted this post because of these communications by the government, that would be a factual finding, a historical fact, but there just aren't such findings. Right. I mean, that's what I was really getting at. Are there findings that you concede, that one you have to apply clear error review to, that one you have to do the same? We do. And I can't give you a list because there's a lot of facts in this case, but we agree historical factual findings count. What we say don't count are findings that are really characterizations, which is a lot of what my friends are relying on, findings that are about the application of law to facts, which in this constitutional realm we think get an over-review, and then findings that are premised on erroneous legal standards. So Mr. Fletcher, I just want to nail down what your views are on the legal standards. On traceability, you're not disputing that a motivating factor is enough? We haven't made that argument here. That's right. Okay. And then on redressability, what's your view of the legal standard the court should be applying? I think, again, it has to be some showing that I think likely to redress the injury is the standard from Lujan. So it doesn't have to be certain, but you have to make some showing that an injunction against the government will stop the platforms from doing what they want. In Massachusetts v. EPA, we've said likely to some extent. Is that strike use correct? I think in the context of Mass v. EPA, maybe where you're talking about a problem of degrees, here where the concern is, are the platforms going to moderate my posts or not, and are they going to do it because of the government or not, and will an injunction against the government stop Facebook? To some degree, is that an acceptable standard to the government? I just want to know what my yardstick that I'm supposed to measure these allegations against, and there's not a lot in your brief about it. So I take likely from Lujan. I take to some extent from Massachusetts v. EPA, and I take the statement in Larson that it doesn't have to redress every injury. Agreed. You're agreed with all of that? Except that to some extent, I think what was there, the state's injury was about rising sea levels, and so to some extent means it doesn't have to solve the problem. It has to help it a more discrete act of content moderation. Do you agree with that standard, though, that to some extent, if they could show that their injury would be remedied to some extent by an injunction, that that would be enough? Correct. So if they're likely to face moderation on 10 posts and an injunction against the government would make it eight, that's enough. Okay. And then just flipping back to traceability, I'm sorry, I forgot to ask, the substantial motivating factor obviously means it doesn't have to be approximate cause. Agreed. Okay. Thank you. Mr. Fletcher, when I read all of the emails exchanged between the White House and other federal officials and Facebook in particular, but also some of the other platforms, and I see that the White House and federal officials are repeatedly saying that Facebook and the federal government should be partners. We're on the same team. Officials are demanding answers. I want an answer. I want it right away. When they're unhappy, they curse them out. There are regular meetings. There is constant pestering of Facebook and some of the other platforms, and they want to have regular meetings, and they suggest rules that should be applied, and why don't you tell us everything that you're going to do so we can help you and we can look it over? And I thought, wow, I cannot imagine federal officials taking that approach to the print media, our representatives over there. If you did that to them, what do you think the reaction would be? And so I thought, you know, the only reason why this is taking place is because the federal government has got Section 230 and antitrust in its pocket, and to mix my metaphors, and it's got these big clubs available to it, and so it's treating Facebook and these other platforms like they're subordinates. Would you do that to the New York Times or the Wall Street Journal or the Associated Press or any other big newspaper or wire service? So there's a lot packed in there. I want to give you one very specific answer first, and then step back out to the broader context. So specifically, you mentioned demanding an answer right away and cursing them out. The only time that happens is in an email that's about the president's own Instagram account. It's not about moderating other people. Okay, we'll put that aside. There's all the rest. Constant meetings, constant emails. We want answers. We're partners. We're on the same team. Do you think that the print media regards themselves as being on the same team as the federal government, partners with the federal government? So potentially in the context of an effort to get Americans vaccinated during a once-in-a-lifetime pandemic. I really think that piece of context, it doesn't change the First Amendment principles, but it's relevant to how they apply here, and I think it's important to understand that at this time, this was a time when thousands of Americans were still dying every week, and there was a hope that getting everyone vaccinated could stop the pandemic, and there was a concern that Americans were getting their news about the vaccine from these platforms, and the platforms were promoting, not just posting, but promoting bad information. I understand all that, and I know the objectives were good, but once again, they were also getting their news from the print media and the broadcast media and cable media, and I just can't imagine the federal government doing that to them, but maybe I'm naive. Maybe that goes on behind the scenes. I don't know, but it struck me as, wow, this is not what I was expecting. I think this is important, because I have the same reaction that you do, that these emails look unusual. I think the idea that there'd be back and forth between the government and the media isn't unusual at all. When the White House press secretary on July 16th is asked about this by the press at the time, what she says is, of course we talk to the platforms just the way we talk to all of you, when we have concerns about what you're doing, when we have information that you might find helpful. Now, there's an intensity of the back and forth here, and there's an anger that I think is unusual, but the context for that, I think, is that these platforms were saying publicly, we want to help. We think we have a responsibility to give people accurate information and not bad information, and we're doing everything we can to meet that goal. That's where this language of partnership comes from. It's not just from the White House. It's these platforms, which are powerful, sophisticated entities, saying we're doing the best we can, and the anger, I think really most of the anger when you read the emails, and I appreciate that you have, because I think you have to look at them in context. The anger is when the officials think that the platforms are not being transparent about the scope of the problem or aren't giving information that's available. Let me ask you one more question, and then I'll stop, at least for now. You make a big point in both your brief and your reply that states don't have First Amendment rights, but are you saying that they may have a free speech right, but it comes from someplace else, or they don't have free speech rights? Do you think that the federal government could prohibit a governor or the top-ranking public health official in a state from speaking to the No, I don't think it could, and I want to be clear. We're not denying that they have speech rights. We're saying that those things, like the federal government's speech rights, come from the structure of our Constitution, not from the First Amendment. This is a First Amendment case, and I think really what's happening here is that these states, which were the motivating factor behind the suit, the only plaintiffs in the initial complaint, are really trying to represent and to litigate the First Amendment rights of their citizens on their citizens' behalf. We think that's an end run around the limit on parents' patriotic standing, just like the one that... Thank you. I think on the anger point, I guess I'd assumed thought experienced government press people throughout the federal government who regularly call up the media and berate them. Is that not your understanding? You said the anger here was from my own experience. That's fair. I guess I don't want to endorse berate, but I guess I will say I bet this is not the first time that there's been profanity or intemperate language in exchanges between White House or agency communication staff and members of the press. Well, I don't know whether our public information officer is here today, but maybe she should take a note about this. So whenever they write something that we don't like, she can call them up and curse them out and say, why don't we be partners? We're on the same team. Why don't you show us what you're writing beforehand? We'll edit it for you, make sure it's accurate. So Justice Alito, this is why I want to be careful here. I'm acknowledging the reality that this happens and that it may be commonplace. I'm not saying it's a good thing or a great thing or anything to be celebrated, but fundamentally I'm saying the First Amendment isn't a civility code. It is an important protection. It's a critical protection against actual coercion, but I think it's important to police that line. And I think this case, the sprawling audit of all of these communications, shows the danger of allowing parties, especially parties without real direct injuries, to come into court and to challenge these sorts of regular back and forths. On a partner's point though, that does strike me as unusual. I mean, what do you think about that? So that I think is traceable to the unusual feature here of this is not the government where the platforms were saying, we don't want to deal with you about this. And the government is calling them up and saying, no, we're partners. Let's be partners. You could imagine a situation like that where there might be a problem. You might start to think that that starts to shade into coercion, but here it's an open door. The platforms are saying publicly, because they're getting public criticism about this from other people too, from the press, from the World Health Organization, from others. They're saying publicly, we want to do our part. We recognize we have a responsibility that we're a source of information for people and we want to be a source of good information. And so when the White House calls and says, we have some concerns about this, they say, we agree. That's a good point you make over here. We disagree with you over here. We're not going to go this far, but we agree with you. And Mr. Fletcher, whether or not that ultimately becomes a first amendment violation. I mean, I appreciate the coercion point and that's sort of the government's first point with respect to the merits of this, but I'm interested in your view that the context doesn't quote, change the first amendment principles. I mean, I understood our first amendment jurisprudence to require heightened scrutiny of government restrictions of speech, but not necessarily a total prohibition when you're talking about a compelling interest of the government to ensure, for example, that the public has accurate information in the context of a once in a lifetime pandemic. So I'm just interested in the government sort of conceding that if there was coercion, then we automatically have a first amendment violation. So I'm not conceding that that would be the case. I could imagine that in times of pandemic, if there were actual restrictions, maybe those would be justified. But our position here, because we think it's the position consistent with the facts, is that there wasn't any coercion to begin with. Mr. Fletcher, on that point, you mentioned coercion repeatedly in terms of threats. Can there also be coercion in your view in terms of inducements? We think there can. I think often a threat or an inducement is sort of the flip side, one or the other. I think in the next case, you could construe it either way, threat of prosecution or offer of leniency. So we acknowledge that it can be both, but it has to be a threat or an inducement of some concrete government action, not just a more government speech. And hypothetically, and I'm not saying this happened here, but would a threat or an inducement with respect to any trust actions qualify as coercion? Sure. And a threat or one is that these are executive branch officials who don't have the ability to unilaterally enact 230 reform. I get the question. They have a power to influence that. Influence that. But the question is, would that be enough to say we're going to, if you don't do X, we are going to change our position on section 230. So potentially, yes, as to legislation 230. If I could just get this out, though, I think it's different because 230 is about content moderation. It's about this very issue. And I think the government official has to be able to say, I support section 230 reform because I'm concerned about these things. And also in the meantime, I think platforms should be doing better. I understand that. But in terms of advocating for change of section 230, that could be coercion in your view. If it were framed as a threat. And how about saying you were killing people? Could that be coercion in some circumstances that if you don't change your moderation policies, you're responsible for killing people? So I think that one is much harder. That's a statement that President Biden made off the cuff. Listen, I'm not talking about the context specific issues, and I understand you have arguments there, but could that in some circumstances, an accusation by a government official that unless you change your policies, you're responsible for killing people. Could that be coercion? So I find it hard to imagine a situation where that sort of public statement could be. I'll acknowledge, as you say, context matters a ton. And so I don't want to say it's impossible. All I'm saying is it didn't happen here. The president said this to the public in the middle of a pandemic. And then three days later, I think this is important. He clarified. He said, I'm not saying Facebook is killing people. I'm saying the people spreading misinformation are. And when he was asked, will you hold the platforms accountable? He's explicitly asked this. Will you hold them accountable if they don't do better? He said, I'm not looking to hold anyone accountable. I just want everyone to look look in the mirror and imagine what would happen if this misinformation was going to their loved ones. I think it's clear that this is exhortation, not threat. Thank you, Mr. Fletcher. How are we supposed to evaluate that question and what the what the level at which coercion kicks in? I mean, if you're trying to coerce or get a particular result out of a media outlet, is it enough to say, you know, if you don't do this, we're going to move your reporter's cubicle down the hall? Or how do you evaluate when it constitutes coercion in this context? So let me start with I think Bantam Books has been the lodestar for the lower courts that have mostly coalesced with some errors in application like this case around the idea of the question is, is it a threat or a statement that a reasonable person would understand viewed objectively and in context as an implicit or explicit threat of some adverse government action? Now, as to the cubicles question, I sort of don't know if there are some adverse government actions that are so trivial that they don't count. I guess I think something like that seems less likely to be a coercive threat. But but in general, I think our position is, if there's something that the government is saying that we're going to exercise government power in some way, unless you change your speech in some way or stop distributing the speech of others, if it's reasonably understood as that sort of a threat, that's a First Amendment problem. Well, but under Bantam Books, it presumably is in context, what you're talking about a person. I mean, if there is as a regular basis, the kind of back and forth between a spokesman and a member of the media, what a reasonable person might view is as coercive might not in that context, you know, you know, maybe the press secretary yells on a regular basis, and if their, you know, volume increases enough, that might be viewed as coercion. So I think that points out the context sensitivity, I think, as is usually the case, when the court says it's a reasonable person test, it's a reasonable person with knowledge of all the facts. And I think that would include the prior course of dealing between the relevant government official and the relevant recipient. I think here that really strongly reinforces the idea that there wasn't coercion, these were sophisticated parties, they routinely said no to the government, they were open about it, they didn't hesitate to do it. And when they said no to the government, the government never engaged in any sort of retaliation. Instead, it engaged in more speech, ultimately, the President and the press secretary and the Surgeon General took to the bully pulpit. We just don't think that's coercive. Justice Thomas. Mr. Fletcher, back to my point about coercion. Couldn't you simply do the censor someone or prevent other speeches, speech by others by agreeing with the platforms as opposed to coercing the platforms? I guess I'm not sure what you mean by agreeing. Well, you just work together, said, look, we're right, they're wrong. Let's work together. You know, we're on the same team. Let's work together to make sure that this misinformation doesn't gain sort of any following. So I think as long as the platforms are exercising their own independent judgment, that's what the First Amendment protects. It says we don't want the government. So you're saying that you can't, the government can't censor by coordinating with private parties to exclude other speech. I'm saying that when the government persuades a private party not to distribute or promote someone else's speech, that's not censorship. That's persuading a private party to do something that they're lawfully entitled to do. And there are lots of contexts where government officials can persuade private parties to do things that the officials couldn't do directly. So, for example, in recently after the October 7th attacks in Israel, a number of public officials called on colleges and universities to do more about anti-Semitic hate speech on campus. I'm not sure and I doubt that the government could mandate those sorts of changes in enforcement or policy, but public officials can call for those changes. The government can encourage parents to monitor their children's cell phone usage or internet companies to watch out for child pornography on their platforms, even if the Fourth Amendment would prevent the government from doing that directly. All of those are contexts where the government can persuade a private party to do something that the private party is lawfully entitled to do. And we think that's what the government is doing when it's saying to these platforms, your platforms and your algorithms and the way that you're presenting information is causing harm and we think you should stop. And the platforms are... So you really don't see any difference between the government coordinating with the platforms to exclude other speech and persuading the platforms to do this, to not engage or permit other speech? I guess I'm not seeing it. And I think that what happened here was definitely on the... If you do think there's a difference between those two things, I guess my argument here would be that what happened is on the persuasion side of the line, because you do see that back and forth at the platforms throughout the process, saying no repeatedly when they disagree with what the government is asking them to do. And I think that that tells you that what was happening here is what the First Amendment protects, which is private speakers making independent judgment informed by, maybe even influenced by the government. So there's no difference between the platforms meeting and working out an arrangement not to permit certain speech and the platforms working with the government to do the exact same thing. There's no difference. Well, I think if the platforms entered into some agreement amongst themselves, that might raise issues under different provisions of law. The modest point I'm making is just that the government doesn't violate the First Amendment when it persuades another speaker to not distribute speech by someone else. That's Penthouse versus Meese, Judge Silberman's opinion there. That's what happens when the White House press secretary calls up the New York Times and says, that was a bad op-ed. You shouldn't run op-eds like that anymore. I think that's commonplace. Justice Alito? On the traceability causation question, under Mental Healthy, if the plaintiffs show that the government's actions were a motivating factor, it is not their obligation. Isn't this true to show that the platforms would not have done what they did were it not for what the government did? It would be the defendant's obligation to show that. So I confess, Justice Alito, I'm not sure that the court has ever gotten through whether that burden-shifting inquiry applies in the context of traceability as opposed to an amount-healthy merits-type inquiry. I guess what I'd say is the court has been pretty emphatic that when your injury is attributable to independent choices by private actors, that's not traceable, and our submission is that that's what happened here. Wouldn't it be very strange to have a stricter standard on the merits, a less defendant-friendly standard on the merits than at the standing stage? It seems odd. One last question, really quickly. You've never argued that this case is moot? We have not, no. Thank you. Justice Sotomayor? Counsel, you don't do a lot with Clapper, and it seems that Clapper really does change all of the cases in terms of requiring a heightened traceability standard, does it not? So I think Clapper is very instructive here. We do cite and rely on it. We think it's relevant at traceability. We think it's perhaps most relevant at the future injury question, because I think we're right about traceability of all of the past moderation of their content that they talk about. But I think we're on even stronger ground in saying that the vast majority of the things they're talking about are about COVID-19 or unusual idiosyncratic stories from the 2020 election, and their burden is to show that they face an imminent threat. That's from Lyons, that's from O'Shea, that the injury is going to recur. That's Clapper, too. And what Clapper also says, and this is instructive, is that to the extent they're censoring themselves, which is what they say, in the absence of such an imminent threat of  COVID-19, they're not going to be able to do anything about it. I'm not sure this record is enormous, but do we know exactly what was censored for that 90 days? So that's the problem. I don't think we do. I was looking for it and couldn't find it. And when I tried to go through the red brief, pages 19 to 21, and connect up the dots here, one of the things that's hard is that there's not a lot of specifics about even the dates on when things happen. I guess I will say when the dates are provided, though, they don't line up. The very first example on page 19 of the red brief is, I think it's Ms. Hines, she gets her retweet of Robert F. Kennedy Jr. suppressed by Twitter. And she says, that's an indication that my harms are traceable to the government because the government was talking about Robert F. Kennedy Jr. But she doesn't say that the government's statements happened between January and July of 2021, and the moderation of her retweet happened in April of 2023, years later after Twitter had sold, after it had abandoned the COVID-19 moderation policies that are at issue here. I think that's a strong indication that there's a real traceability problem, and it just gets worse when you look to the forward-looking injury that they have to establish. Thank you. Justice Kagan? On the coercion question, is there anything that we have to review on clear error, or is it all legal? I give you the same answer I gave before. I think historical fact, the statement was made, it was not made. If there were specific factual findings beyond that, again, historical facts, we'd acknowledge they're clear error. But things like, this was pressure, this was coercion, we think those are characterizations. And then the ultimate standard, the ultimate First Amendment standard of was viewed objectively and in context, this communicating a threat, we think that's either law or maybe more probably law to fact that gets an over-review the way it usually does in the constitutional realm. And on the past harm, future harm question that you were just talking about, I take it if no future harm, that's independently sufficient, is that right? Correct. And would there be any difficulties with confining a holding to that if we were to find for you? I don't think so at all. I think in some ways that's the narrowest, easiest way to resolve this case is to say, this is an action for injunctive relief. They have to show that they faced an imminent threat of future harm. We don't have to adjudicate the parties' disputes about the past harm. We just have to show that they haven't met that burden. Thank you. Justice Gorsuch, on that question, in your view, when is the time that we should be considering that? Probably not today, it seems, right? It would be the time that the court, in the first instance, issued the PI. Is that your view? So I think it might be even earlier than that, just to be candid. Might be the complaint? That might be the complaint. So the complaint for the states is I think May of 2022, the individuals get added in August of 2022. The place where I think I know for sure that the PI matters, though, is whether they've shown a likelihood of irreparable harm, which above and beyond standing as a requisite for injunctive relief. I think that has been shown at the PI. Okay. So that's the relevant date. Okay. And then when we're looking at coercion, is it in your mind a relevant consideration that the industry is very concentrated and that therefore coordination problems that otherwise might be difficult with the media, which are very diverse, might not be present in some cases? So again, context matters. And I think in some ways, the fact that these are very large, very powerful corporations cuts against a finding of coercion because they are very sophisticated. They didn't have any problem. They weren't shy about saying no to the government. I hesitate to say, though, that it suggests that you should change the First Amendment standards. I think the night brief... I'm not suggesting that. The night brief does discuss this and says it might be a relevant factor that there's such a concentration that it makes coordination between government entities and private entities easier. Do you disagree with that? I'm not sure whether or not I agree with that. But I think the point is that for our purposes, the constitutional line is between coercion and not coercion. No, I understand that. So context specific inquiries we've discussed, you pointed out one way in which concentration might make it less susceptible to coercion. Do we have to account for the possibility as well that in some circumstances, and I'm not, again, not case specific, it may make coercion easier? So if that were true, you would have to account for it. The reason I'm resisting is because I think the concerns about concentration in the industry go more to the potential effects of coercion happened at all. I get that. I'm sensitive to that. And the point that I was trying to draw from the night brief was the First Amendment isn't the answer to problems of concentration. No, I take your point. Thank you. Justice Kavanaugh? So I understand your key legal argument is, I think, but correct me if I'm wrong, that coercion does not encompass significant encouragement or entanglement, and that it would be a mistake to so conclude because traditional everyday communications would suddenly be deemed problematic. Exactly right. And really, what the lower courts have done here, I think, is to go beyond the coercion test and sort of openly say, we're going to open up this state action encouragement door. And that, I think, risks turning the platforms and lots of other entities that are interacting with the government into state actors and restricting their editorial choices under the First Amendment. By coercion, you mean threat of legal consequences? Adverse government action. Adverse government action. Okay. Then on the killing people hypothetical, or not hypothetical, the statement, I mean, that raises national security analogies. I don't know what your experience is, if you've looked into this, but probably not uncommon for government officials to surveillance or detention policy and say, you know, if you run that, it's going to harm the war effort and put Americans at risk. I can't profess to have had personal experience with that. I know it has happened. The night brief talks about some examples. And I think that's an example of a valuable sort of interchange, as long as it stays on the persuasion side of the line. I think newspapers want to know if they're publishing a story might put lives at risk, and they don't have to listen to the information that they can consider in exercising their editorial. But they tack on to that. And if you publish the story, we're going to pursue antitrust action against you. Huge problem. Yeah. Right. Okay. And then you haven't really described what you think the common interactions are. I mean, what do you think those are? At issuing the complaint or? No, just in general, you're speaking on behalf of the United States. Again, my experience is the in all its manifestations, has regular communications with the media to talk about things they don't like, or don't want to see or complaining about factual inaccuracies. But be interested in what you want to describe about that. So I think that's absolutely right. I won't profess to give you a comprehensive overview. We've looked at this very carefully in the context of these defendants, because we've a couple times been under the shadow of this injunction. And so we've wanted to understand exactly what would be at stake there. And so I think it comes into a couple of different buckets. One of them is engagement on matters of public policy. And I think that's what was going on here. I think childhood mental health, anti-Semitic speech, Islamophobic speech online are in that category. Those are issues where the White House, the Surgeon General, others might want to make their views known to use the bully pulpit to call on the platforms to do more. Another is the national security space. I think the record is clearest there on the FBI providing these foreign malign influence selectors to the platforms for the platforms to take action, or briefing them on foreign threats or about terrorist activity happening on the platforms. There's also a domestic law enforcement side of things, child exploitation, other things like that. The platforms are a vector for those sorts of activities. And the government communicates with them about that. There's also election integrity issues, false statements about the times, places, or manners of elections saying the polls have closed early, don't bother coming to vote in an effort to suppress people's vote or Democrats vote on Wednesday, Republicans vote on law enforcement entities. And then I think there's also the CDC's interactions, which involve providing advice, you know, by the way, we're seeing a lot of this information circulating on your platform, it's not true, or it's misleading about something that we've put out, or even just answering the platform's questions. I think one of the flavors you get from the amicus briefs on our side of the case is there are a lot of valuable ways where the government has information or expertise that it can offer to private speakers, and it would be a shame to chill that. Thank you. Justice Barrett. So this might be a question about the distinction or the interplay between bantam books and just state action more generally. And Justice Thomas's questioning of you towards the end, he was talking about the distinction between encouragement and coercion. So what if Facebook said, and this is counterfactual, it's not what happened in this case, but what if Facebook said, you know what, we're partners, we're on the same team, this is a once in a lifetime pandemic, and we think it would be most efficient and most helpful for the That's not coercion. That's voluntary on Facebook's part. But wouldn't it be state action, then? So to me, it starts to veer over. And obviously, with all the caveats, state action is incredibly context specific, I don't want to be definitive. But to me, that starts to verge more over into the joint action, we're doing something together, the government is doing things, it's actually making decisions. It's not just advising or persuading the platforms. I think the rubric may be what that may well be state action. But the rubric would be, I think, more sound in the joint action cases than under significant encouragement, which has never been just us trying to persuade you to do something. How do we consider the relationship between those two things? Because I agree with you, Bantam Books is about coercion and drawing the line there. But clearly, there are some times when things veer into the joint action space, where we would say that maybe there is state action. And there's a dispute in this case, it comes up in the next one to about which framework is the right one? What advice do you have? Yeah, so again, I think if I were the court, I would want to be cautious about making two definitive pronouncements. I would say that here, what's challenged is the persuasion, exhortation, bully pulpit, provision of advice, provision of information. And that when those things are at issue, the main yardstick is going to be Bantam Books, the main concern is going to be have you crossed the line from just really trying to persuade to trying to threaten and the Bantam is the right way to draw that line. I think there are a lot of different amicus briefs from a lot of different parties, like the chamber and that choice. They all agree that's the right line in this context. I think you could reserve and it'd be a very different question if you're talking about the government and the platforms acting together, turning over operational control, integrating their operations. That's a different case, it might present hard state action issues, but it's just really not the kind of issue here. And not alleged here. Exactly right. Yeah. My other question is about the findings of fact and clear errors. So you were pretty insistent with Justice Kagan that we really, to address the standing point, don't have to review any of the district court's factual findings for clear error. I just want to make sure that that's right, because I'm thinking about things you talked about with, I think it was Justice Alito, the interchange with the expletives, you know, we're getting mad, we want answers now, you know, are you whatever serious. And that was actually about his own Facebook account, or there was another change that was exchanged that was actually about somebody impersonating the president's granddaughter on Twitter. So if the lower courts, which I think they did, conflated some of those threats with threats that were designed to be threats related to the pandemic, and that kind of suppression, wouldn't that then be clear error? Or do you think that's application of facts to law or what? So I apologize. I didn't mean to say that there's no clear error here at all. I just meant to say it would be findings of historical fact. I think the ones that count, those count, those do get clear error review. But I think we pointed out places on the salient ones, where they just are clearly erroneous. They're just demonstrably inaccurate in the two cases that you just identified. So there we might agree clear error applies, but to the extent that the lower courts were suggesting, and really more the district court than the Fifth Circuit, but a little bit the Fifth Circuit too, that things were said to speakers that weren't said that the press secretary said words she never said, our argument there would just be that those are clear error. So in considering traceability, you would say that maybe there are some things that we would review for clear error, because the erroneous, assuming that you're right, the erroneous conclusions about traceability depended partly on factual errors, and then partly on applications of a lot of facts. And incorrect moral standard, yeah. Thanks. Justice Jackson? So I guess I didn't perceive there to be such a sharp distinction between Blum and Bantam Books. The government seems to be arguing here that Bantam Books is the way to go, that Blum is not the right test. And I appreciate that Blum uses significant encouragement, but I think it says the question is whether the government, quote, has provided such significant encouragement, either overt or covert, that the choice must, in law, be deemed that of the state. That it's sort of suggesting, in the same way that Bantam Books is, that it's really about coercion as opposed to just encouragement. So am I wrong to think there's really not that much difference between the two? So I don't think you're wrong there. I think we say that that's the way you ought to read the significant encouragement language, that it's positive incentives of government action that overwhelm the private party's choice and make it really the government's choice, not the private party's. You can just view that as the flip side of the sort of coercive threats from Bantam Books. I think the reason why you may have sensed me today and us in our briefs resisting Blum is because the lower courts and my friends on the other side have really tried to turn that significant encouragement language into something quite different, into circumstances where the government encourages in some colloquial sense by urging or persuading or, you know, really strongly advocating something, and we just don't think that's what Blum means or what this court's state action cases have ever said. Okay. I understand that. And even if we have a world in which significant encouragement is verboten, is there something different to the government providing information? Yes. I'm a little worried about the respondents, what I think could be taken away from their view, which is that in situations in which the government has information that may be unique to the government's knowledge, but that it feels important for the public to have, that that somehow becomes prohibited if, as a result of that information, these companies decide they're going to do something different with respect to content moderation. That's our big concern, too, and that's exactly what the lower courts found across the line, the FBI providing information about covert foreign actors on platforms, the CDC providing information or even answering questions about matters of public health. I think it'd be very troubling to say that those things are impermissible or create state action. Thank you. Thank you, Counsel. Mr. Aguilarga? Good morning, Mr. Chief Justice, and may it please the court. Government censorship has no place in our democracy. That is why this 20,000-page record is stunning. As the Fifth Circuit put it, the record reveals unrelenting pressure by the government to coerce social media platforms to suppress the speech of millions of Americans. The district court which analyzed this record for a year described it as arguably the most massive attack against free speech in American history, including the censorship of renowned scientists opining in their areas of expertise. And the government's levers of pressure are anathema to the First Amendment. Behind closed doors, the government badgers the platforms 24-7. It abuses them with profanity. It warns that the highest levels of the White House are concerned. It ominously says that the White House is considering its options. And it accuses platforms both of playing total Calvin Ball and of hiding the ball, all to get the platforms to censor more speech. Under this onslaught, the platforms routinely cave. And last month in the Net Choice cases, the platforms told you that it's incredibly important that they create their own content moderation policies. But this record shows that they continually depart from those policies because of unrelenting government pressure. Indeed, as Facebook recently disclosed in an internal email to former UK Deputy Prime Minister Nick Clegg, the reason Facebook did that was, quote, because we were under pressure by the administration. We shouldn't have done it. Now, my friend says all this is constitutional because the government has the right to persuade using the bully pulpit. But the government has no right to persuade platforms to violate Americans' constitutional rights. And pressuring platforms in back rooms shielded from public view is not using the bully pulpit at all. That's just being a bully. I welcome the court's questions. Counsel, the I know your argument is basically a Bannon book argument. But do you need coercion in order to do you think that's the only way you could make your case? Or could you coordination accomplish the same thing? That is, the government is censoring by joint actions with the platforms as opposed to rehearsing the platforms? Your Honor, we don't need coercion as a theory. That's why we led with encouragement in our red brief. And I would point the court to what it said in Norwood, which is the court or the government cannot induce, encourage and promote private actors to do directly what the government can't itself do directly. And that's, I think, the principle that's guiding here, which is regardless of the means that the government tries to use to pressure the platforms to commit censorship against third parties, the Constitution really doesn't care about that. It's the fact that what the government is trying to accomplish is the suppression of speech. And I would say, Your Honor, I mean, that's exactly how you address this question in Bannon books. You asked, did the government set out to deliberately suppress speech? The answer in that case was absolutely yes. And that's absolutely the answer in this case here. And I guess, you know, I would say, you know, when this court considered Bantam books, one of the key things about the analysis in Bantam books was it was an obscenity case. And, you know, the court struggled with whether the states had the right to police the line between legitimate speech and illegitimate speech. And that was why you were talking about coercion. In that case, you were asking whether the reason we were asking about coercion is because the private parties could have chosen on their own to censor that speech. They could have said, we think it's obscene. I'm not going to be involved in this. The only issue became when that choice was overwritten by the government. And so I don't I think you're you're you're mixing sort of situations and confusing legal doctrines. No, Your Honor, the fundamental principle, and this comes from Norwood, and it's central to this court's First Amendment cases, this Fourth Amendment case, is that the government can't do indirectly what is prohibited from doing directly. And that's what you see happening in Bantam books. That's what you see happening in a case like this, because time and again, there were times where the social media platforms had policies that didn't go far enough in censoring the speech that the government wanted them to censor. But whether or not the government can do this, this is something I took up with Mr. Fletcher, depends on the application of our First Amendment jurisprudence. And there may be circumstances in which the government could prohibit certain speech on the Internet or otherwise. I mean, do you do you disagree that we would have to apply strict scrutiny and determine whether or not there is a compelling interest and how the government has tailored its regulation? Certainly, Your Honor. I think at the end of every First Amendment analysis, you'll have the strict scrutiny framework in which, you know, in some national security hypothesis, for example, the government may well be able to demonstrate a compelling interest, may well be able to demonstrate a narrative. So not every situation in which the government engages in conduct that ultimately has some effect on speech necessarily becomes a First Amendment violation, correct? Maybe not necessarily, Your Honor. I guess the top line question I would ask is, has the government set out to rebridge the freedom of speech? And in this case, you see that time and time again, because if you control it— That's not the test for First Amendment violation. Your Honor, this flows from the plain text of the First Amendment, right? No, I understand. But we have a test for a determination of whether or not the First Amendment is actually violated. So in certain situations, you know, the government can actually require that speech be suppressed if there's a compelling interest, right? It can, Your Honor. And I guess what I would say is that the courts below never got to strict scrutiny because the government never raised it. This has never been litigated. The question in this case is whether at the front end, the government itself has undertaken action. It's the coercion. It's the state action, right? That's the question in this case. And I would urge the court to address the state action issue just like you addressed it in Bantam Books. Use that term four times in Bantam Books. And couldn't you just understand, because it seems like an extremely expansive argument, I must say, encouraging people basically to suppress their own speech. So like Justice Kavanaugh, I've had some experience encouraging press to suppress their own speech. And you just wrote a bad editorial. Here are the five reasons you shouldn't write another one. You just wrote a story that's filled with factual errors. Here are the 10 reasons why you shouldn't do that again. I mean, this happens literally thousands of times a day in the federal government. Yeah. And I would say in the mine room case that you're describing to me, it's the government going after the speaker itself and trying to get them to change their speech. What's so pernicious here is that you don't see any of these facts in this record unless we get discovery, which is when Rob Flaherty, who's deputy assistant to the president, sends an email to Facebook or to Twitter and complains that they're not doing enough to censor what they view as vaccine hesitancy speech, America never sees that. And the third party, people like Jill Hines and Jim Hoft, whose speech wishes to express the kinds of viewpoints that the White House is targeting, they never know that that's happening behind the scenes. And I think it makes a difference, Justice Kagan, that you have an intermediary here who really has no incentive to itself defend Jim Hoft's speech or to defend Jill Hines' speech. In the New York Times hypothetical, you have a story publication that itself is familiar with those. What about op-eds? What about op-eds? Your Honor, and with op-eds, you know, if it's a third party speech, that happens too, right? And I guess there are a number of ways I would think about that, Your Honor. One is, if the newspaper declines to run an op-ed because the government asked, that op-ed author can go to any number of other publications and it has an outlet. It's not the same here, because if I'm on Twitter and I wish to express a viewpoint that the government wishes to censor, and Twitter bows to that pressure, then I lose my count. I was just going to say, first, I have no experience coercing anybody. But second, I mean, the government is not monolithic either. I suspect when there's pressure put on one of the platforms, or certainly one of the other media outlets, they have people they go to, probably in the government, to say, hey, they're trying to get me to do this, and that person may disagree with what the government's trying to do this. It's not monolithic. And that has to dilute the concept of coercion significantly, doesn't it? Your Honor, I'm not sure I agree with that. And I guess I'd get back to one of the earlier points I made, which is, whether you call this coercion, if that's the label you attach, you call it encouragement, you call it promotion, you call it inducement, whatever it is, if the government is attempting to abridge the speech rights of a third party, that has to be unconstitutional, because that falls within the plain text of the First Amendment. And so this is Bantam Books of the 21st century. You haven't had a case with social media platforms like this, where third-party speech is so at risk of being censored. I mean, how do you analyze a situation where, you know, maybe the EPA is trying to coerce the platform about something, and the Army Corps of Engineers is trying to coerce them the other way? I mean, you can't just sort of pick and choose which part of the government you're concerned about. Obviously, it's a different one when you're talking about what the President is saying in particular. But other than that, I think it's a very more fluid situation than anything else. It is fluid, Your Honor. But I would say that when you have, as we have, plaintiffs in this case who wish to express certain viewpoints that have been specifically targeted by the government, you know, it's not at least fluid in these facts. And this is not a case just about COVID. It's a case about election integrity. It's a case the district court has a finding about how the government wishes to— So, I mean, what about that? I mean, you know, take an example where, I mean, these platforms, they're compilers of speech. And some part of the government, let's call it part of the law enforcement arm of the government, says, you might not realize it, but you are hosting a lot of terrorist speech, which is going to increase the chances that there's going to be some terrible harm that's going to take place. And we want to give you this information. We want to try to persuade you to take it down. The government can't do that? The government can absolutely do that, Justice Kagan. They're asking them to take down the speech. Terrorist activity, criminal activity that is not protected speech, absolutely, the government can inform the— Well, much of it might be protected speech. I mean, terrorists engage in, you know, things that come under the First Amendment. I mean, let's say they're just recruiting people for their organizations. Your Honor, if it's First Amendment speech, protected speech, then I think we're in an entirely different world. I mean, that's a case where—and this comes up in the FBI findings that the district court made, because what was happening is the FBI was sending teleporter-encrypted messages to the platforms identifying what the government represents as foreign actors. The district court found the government was not distinguishing between whether it was domestic or foreign conduct. And the way this issue arises is when maybe you have a foreign actor who tweets, you know, I love Biden, and there are 20 million people who wish to retweet that, repost that with their own comments saying, heck, yeah, I love Biden, too. When an American does that, that's First Amendment protected speech, Your Honor. And so when the government comes in and tries to take down every single post that contains the core that they say was foreign speech, but they're also taking down the added speech by Americans, that's a square First Amendment issue, Your Honor. So back in—this still happens now. Decades ago, it happened all the time, which is somebody from the White House got in touch with somebody from the Washington Post and said, this will just harm national security. And the Washington Post said, OK, whatever you say. I mean, that was all? You didn't know enough, but that was coercion? Your Honor, I thought I understood the government this morning to say that might be a First Amendment issue. And I think what I would say is if there's a national security interest, maybe the government can satisfy strict scrutiny in that circumstance. What I would also say is we probably wouldn't have a lawsuit based on that, because I don't know how that we would get prospective injunctive relief based on a fleeting, offhand, you know, reach out from the White House. I guess what I'm just trying to suggest is that there's all kinds of things that can appear on these platforms that do all kinds of different harms. And and the inability of government that you're suggesting to to reach out to these platforms and say, we want to give you information that you might not know about on this, and we want to give you our perspective on what harms this is doing. And and, you know, we want to be able to answer questions that you have, because we really do think that it would be a good thing if you on your own. Chose to take this speech down and your honor, if those were the facts in this case, then I think it would be a much harder case for me. I know I don't know what your standard is. You just told me that that was that was good enough for you. That was coercion. No, your honor, because, you know, in that circumstance, you have a platform who is reaching out for the government, reaching out just to identify what it views as the right state of the law, like the right state of facts. The government I mean, this court has made clear for for a while since its plurality in Alvarez that if the government thinks there's false speech out there, the remedy for that is true speech. Nothing prohibits prohibits the government from going to that platform and saying we've seen a lot of false information about election activity and covid and vaccines and the like. Nothing prohibits the government from saying here's a list of everything we say is true. That is true in our view. And you should amplify our speech. And any time that false speech arises, you should put our post right there next to it, saying this is the government's view on this issue. The problem here and this is, you know, I think you see this in the summer of twenty twenty one after the White House goes nuclear on the platforms, is that the platforms themselves reverse course on their own policies. And you see this in our way. Fifteen three twenty two. This is one of the in my view, one of the hottest docs in the in the J.A., because you've got this email from Nick Clegg, who is, you know, former deputy prime minister of the After all this pressure for months and months and months, he sends this email to Vivek Murthy, the surgeon general, and he says, Dear Vivek, thanks for taking the time to meet. I wanted to make sure you saw the steps we took past this past week to adjust policies on what we're moving to take steps to further address the disinfo dozen. We've removed thirty nine profiles, pages, groups, Instagram accounts. We're continuing to make other accounts harder to find. I mean, this is an example of platforms moving beyond what their own policies require, because they felt pressure to take more action and to censor more speech. And your honor, if that's I mean, if that's not the clearest example of the government. Tell me where where you have in the record that the thirty nine accounts that were taken out, that any of them related to any of the. Petitioners here. Sure, your honor. So what I was give me and give me that site again. What I was quoting to you right now is our way. Fifteen, three, twenty two. And what that email from Nick Clegg mentions is the so-called disinformation doesn't. This is a group of people that the government thought was responsible for the majority of so-called health misinformation on social media. Now, in paragraphs five and six of each of the supplemental declarations in the joint appendix, each of our individual plaintiffs specifically identifies the fact that they follow members of the so-called disinformation doesn't. They repost their posts. They engage with their speech. And so when the government or when the platforms here in response to the pressure are taking down contact and accounts related to those individuals called the disinformation doesn't, that is necessarily impacting our plaintiffs right to engage with their speech, to add their own. Not that they've taken down any of their posts, but that they took down someone else's posts. That's what this is saying. That's what I was going to do right now. I don't know how that shows traceability or redressability. In the same vein. I don't think we've ever dispensed standing on the basis of injury to another. Injury to you, but not to another. So, Justice Sotomayor, let me give you Jill Hines one more time. Look at J.A. 793 to 794. This is the tweet that was a screenshot of a tweet that Mr. Fletcher mentioned. And this is censorship four times over. Because this is a tweet in April 2023. It's on the eve of the preliminary injunction hearing. And what she says is this Facebook post that I posted was taken down by Facebook. She got a warning for it as a violation of the community standards. What was that post? It was a screenshot of Robert F. Kennedy Jr., who was a member of the so-called disinformation doesn't. What was the RFK tweet talking about? It was talking about Tucker Carlson, whom the administration was obsessed with. Look at J.A. 701 to 708. I'm sorry. The RFK tweet. There's only a record of the White House asking Twitter to remove a tweet. And not particularly this one from RFK. That doesn't help Hines' claim that the White House asked Facebook to remove anything. It does, Your Honor, because... And this is a good example of the interrelationship between the various media platforms. You have cross-posting. So what happened in this example is Jill Hines took a screenshot of a tweet. And then she moved that over to Facebook and posted that as her own Facebook post. And so when she did that, she moved RFK's tweet. And I was going to describe what was in that tweet. He was talking about Tucker Carlson that the White House specifically targeted in the joint appendix. And I have such a problem with your brief, Counselor. You omit information that changes the context of some of your claims. You attribute things to people who it didn't happen to, at least in one of the defendants. It was her brother that something happened to, not her. I don't know what to make of all this. Because you have a... I'm not sure how we get to prove direct injury in any way. So, Justice Sotomayor, let me start by apologizing if any aspect of our brief was not as forthcoming as it should have been. I would take full responsibility for that. I apologize for that, Justice Sotomayor. What I would add to the second part of your question is I think Jill Hines is the best standing for our case in multiple ways. I think one of the ways you look at her standing is you look at JA 715 to 716. This is an email to Facebook where the government, the White House, specifically asks Facebook to not distribute so-called vaccine hesitancy content and also to target health groups that do that. So that's JA 715 to 716. Then you go down earlier in the JA to JA 631 to 632. This is Jill Hines' allegations. And what she says is two months later, so the email I just described to you from the White House was in May, two months later in July, and then a couple of months later in September, Jill Hines had two health groups in Louisiana that were blocked by Facebook. And I think this is one of the scariest examples in the record of what is at stake here, which is those groups were political action groups. Louisiana had a legislative session in progress. And what Jill Hines was trying to do is mobilize people to support certain bills and other legislative materials that were then pending in the state legislature. But because the government moved its pressure and put them on the scales, you know, a couple of months before, and then lo and behold, once Jill Hines tries to use the exact kinds of groups that the government targeted, she can't. They're pulled down. Her political organization is stymied. And that's, you know, all over the record. And that's just one fraction of the kinds of harm that's at stake here. Okay, can I ask you, no, go ahead. I want to go back to actually your interchange with Justice Kagan about the standards, because I have to confess it left me very confused. It sounded like you are articulating different standards depending on a different legal standard, depending on different factual circumstances. For example, when Justice Kagan gave you the hypothetical of pressure being placed on the New York Times or the Washington Post not to run a particular op-ed, it seemed like you backed off and said, well, significant encouragement wouldn't be enough there because the person who wrote the op-ed can go to another news outlet. You also made the point that this is just different because social media is such a concentrated industry, which is a point that Justice Gorsuch was asking Mr. Fletcher about. So can you clarify, did I misunderstand? Because it seems to me that as a matter of law, the same legal standard would have to apply across all of these areas. I think that's right, Your Honor, and I apologize if I wasn't clear earlier. I guess the top-line legal standard I would start with was this court's line at 635 in Norwood, which is the court can't do indirectly what it's constitutionally prohibited from doing directly. The second line in response to that is, well, what sorts of indirect mechanisms can the government use that would run afoul of that rule? I think one potential mechanism is coercion. Another one is encouragement. This court also has used the term— Just plain, vanilla encouragement? Or does it have to be some kind of significant encouragement? Because encouragement would sweep in an awful lot. I think that's right, Your Honor, and so let me give you two answers to that. The top-line answer is, I mean, I'm a First Amendment purist, and so I would say even mild encouragement, but we don't need that to win in this case because we are so far afield from whatever that threshold is. So if you want to say substantial encouragement like the Fifth Circuit said, and like Bloom said, absolutely, that's a standard that works. But I guess what I don't— Let me just ask you then, let me give you a hypothetical. Let's say that you get doxed, and so do numerous other members in Louisiana State government. You're doxed, and somebody is posting online about how people should really rally and do something about this. People should rally, and you should be harmed, okay? The FBI sees these posts and calls the social media outlet, like X, Facebook, whatever, and says, we really encourage you to take these down because these are significantly threatening, and we see some people maybe responding to them. So my first question, Your Honor, is whether that would be protected speech, those tweets would be protected speech under this court's precedent. Let's assume that everything that's said, I was trying to make it so that they stop short of actually being illegal in and of themselves. Your Honor, so I think, you know, as I say, I'm a purist on the First Amendment, so my answer would be, yeah, like— Do you know how often the FBI makes those kinds of calls? And that's why I have my back up answer, Your Honor, which is, if you think there needs to be more, the FBI absolutely can identify certain troubling situations like that for the platforms and let the platforms take action. I think we're, you know, the hypos are very important, but when you look at what's happening in this case, for example, with respect to the FBI, what they're doing is not, there's no emergency, nothing of the sort, they're just identifying hundreds of accounts— Perhaps they're kind of falling back on, well, this case is different, this case is different, and so a different legal standard should apply, but, you know, what we say in this case matters for other cases, too. It does, Your Honor, and, you know, if that, I guess what I would say in response to that, and I'm very sensitive, obviously, given the fact of the hypo, to the outcome, but if what the FBI is doing is trying to persuade a speech intermediary to take down a private third-party speech, I mean, that is covered by the plain text of Norwood, and that's, I mean, an abridgment of speech, and I, you know, I— I think that part of the reason why you might be running into all of these difficulties with respect to the different factual circumstances is because you're not focusing on the fact that there are times in which the government can, depending on the circumstances, encourage, perhaps even coerce, because they have a compelling interest in doing so, and so that's why I keep coming back to the actual underlying First Amendment issue, which we can isolate in this case and just talk about coercion, but I think that you have to admit that there are certain circumstances in which the government can provide information, encourage the platforms to take it down, tell them to take it down. I mean, what about the hypo of someone posting classified information? They say, it's my free speech, right? I believe that, you know, I got access to this information and I want to post it. Are you suggesting that the government couldn't say to the platforms, we need to take that down? No, Your Honor, because I think that would be a great example where strict scrutiny would cut in the government's favor. All right, so what do we do then in a situation in which—I mean, I suppose in this case, we're asking—the government's point is we didn't coerce, and I appreciate, you know, the debate about that, but you just seem to suggest that as a blanket matter, the government doesn't have the ability to, you know, encourage or require this kind of censorship, and I don't know that that's the case. So, Your Honor, I guess this goes to the bully pulpit as well. I understand that the bully pulpit has never been used to target the object of suppressing a third-party speech. You can use it to coerce behavior. You can use it to coerce companies to take certain actions, but when the government is identifying a specific viewpoint and specific content that it wishes to wholly eliminate from public discourse, that's, I think, when the First Amendment problem arises. And so I guess I'm struggling to find an example in the Court's cases or in history where the Court or anybody else has said the government, by virtue of being the government, can use its power to pressure its speech intermediaries to eliminate entire viewpoints and content from the public discourse. And I think, I mean, that's, that's your... Can I give you a hypothetical? Sure. Suppose someone started posting about a new teen challenge that involved teens jumping out of windows at increasing elevations. This is the challenge. And kids all over the country start doing this. There's an epidemic. Children are seriously injuring or even killing themselves in situations. Is it your view that the government authorities could not declare those circumstances a public emergency and encourage social media platforms to take down the information that is instigating this problem? Your Honor, the government absolutely can use the pulpit to say publicly, here's what we recognize to be a public health issue, emergency is obviously extremely terrible and the public shouldn't tolerate this. We see it's going on on the platforms. But they can't call the platforms and say, listen, we really think you should be taking this down, because look at the problems that it's causing. If it's protected speech, Your Honor, then I think we get closer. But like, look, if you think that that's, if that's clearly the way you're asking the question, I understand that the instinct, that that may, you know, may not be a First Amendment issue. I guess what I'd fall back on, Your Honor, is that at least where the government itself, there is no emergency like this, there's nothing... No, my hypothetical is there is an emergency. My hypothetical is that there is an emergency. And I guess I'm asking you, in that circumstance, can the government call the platforms and say, this information that you are putting up on your platform is creating a serious public health emergency? We are encouraging you to take it down. I was with you right into that last comment, Your Honor. I think they absolutely can call and say, this is a problem, it's going rampant on your platforms. But the moment that the government tries to use its ability as the government and its stature as the government to pressure them to take it down, that is when you're interfering with third-party speech rights. And remember, the third... Go ahead, finish your... Your Honor, I was just going to say, remember that the third party here is completely absent from the conversation. The third party whose speech is being targeted and ultimately censored is absent from this discussion. Well, you don't... Well, do you think that simply Justice Jackson's hypothetical ended by saying, we encourage you to take it down? Does that rise to the level of coercion that you think is problematic? Your Honor, if the test is coercion and that's the test that this court applies, I think I might have a harder case saying that's coercion. I think it's, by its definition, it's maybe easier addressed as a substantial encouragement case. But if, you know, whether you, as I said earlier, regardless of the label that you apply, whether it's coercion, whether it's encouragement or joint participation and conspiracy, at the end of the day, if what the government is trying to do is to eliminate viewpoints from public discourse... Again, under my colleague's hypothetical, it was not necessarily eliminate viewpoints. It was to eliminate instructions, let's say, about how to engage in some game that is seriously harming children around the country. And they say, we encourage you to stop that. I mean, is it, that violates the Constitution? Your Honor, I agree as a policy matter, it might be great for the government to be able to do that. But the moment that the government identifies an entire category of content that it wishes to not be in the modern public sphere, that is a First Amendment problem. And thank you, counsel. Justice Thomas. Justice Alito. Oh, well, Mr. Aguinalda, I think some of your most recent colloquy with my colleagues have gotten off into questions that I didn't take it from your brief. You think we actually need to decide in this case. So I thought your principal argument was that whatever coercion means, what happened here is sufficient. And that coercion doesn't mean only, it doesn't apply only when the government says, do this. And if you don't do this, they're going to be legal consequences. When it says that in the same breath, but it's a more flexible standard than you have to take into account the whole course of the relationship regarding this matter. That's what I took to be your principal argument. Did I understand that correctly? That's correct, Your Honor. And there's an entire volume. I mean, we've got 20,000 pages in this record of the government persistently going back to platforms again and again, pushing them to adjust their policies, change their policies, do more censoring. I think that's what makes this case so unique is that you not only have this vast repetition of communications, but it's all, again, the bulk of it is behind closed doors. And that's what's so pernicious about this is that if we don't have a remedy in this case, then it's hard to see how there will ever be a remedy for a future plaintiff who turns out to be censored, but it's difficult for that person to even identify whether that censoring actually happened. And you got all this information only through discovery, is that correct? That's correct, Your Honor. Thank you. Justice O'Neill? Justice Kagan? Can we go back to the standing question? And if I ask you for the single piece of evidence, and maybe this is the piece that you were describing earlier, I just wanted to make clear what your answer was. The single piece of evidence that most clearly shows that the government was responsible for one of your clients having material taken down, what is that evidence? And, you know, what does it say about how the government was responsible? Sure, Your Honor. So as I say, I think Jill Hines is the best example for us on standing. To give you one more example... Yeah, even on that one, I guess I just didn't understand in what you were saying, how you drew the link to the government. I mean, we know that there's a lot of government encouragement around here. We also know that there's, the platforms are actively content moderating, and they're doing that irrespective of what the government wants. So how do you decide that it's government action as opposed to platform action? Your Honor, I think the clearest way, and if I understand, so let me answer your question directly, Your Honor. The link that I was drawing there was a temporal one. If you look at JA 715 to 716, that's a May 2021 email. Two months later, after that email calls for targeting health groups, just like Jill Hines' group, she experiences the first example of that kind of group. Yeah, so in two months, I mean, a lot of things can happen in two months. So that decision two months later could have been caused by the government's email, or that government email might have been long since forgotten because there are a thousand other communications that platform employees have had with each other, that a thousand other things that platform employees have read in the newspaper. I mean, why would we point to one email two months earlier and say it was that email that made all the difference? Your Honor, and I would say a thousand other emails between the White House and Facebook in those two months.  this back and forth between the platform and the government. And it's all about the same topic. But if it's encouragement, I mean, let's even take that this was something that the government was continually pressing, encouraging the platforms to do. I mean, until you can show that there's something about overbearing the platform's will, you know, seems sort of hard to overbear Facebook's will from what I can gather from the world. But, you know, how do you say it's the government rather than Facebook? Your Honor, I guess what I would say is we're in the context in which these communications arise. The Facebook emails are attempting, they say these terms like partner, they're trying to work with the government. And, you know, you could say the same thing about how do you know it's Facebook, not the government? How do you know it's the government, not Facebook? You could ask it either way. I think what we do know... Well, you're exactly right. I think what we do know... Pretty much everything that's in your brief, that there's just nothing where you can say, OK, the government said, take down that communication. The government is making some broad statements about the kinds of communications it thinks harmful. Facebook has a lot of opinions on its own about various kinds of communications it thinks harmful. I guess if you're going to use standard ideas about traceability and redressability, I guess what I'm suggesting is I don't see a single item in your briefs that would satisfy our normal tests. So, Your Honor, look at Jill Hines and I'll give you one more example. Look at page 20 of the red brief. This is the Jim Hoft example because we know that his name and the Gateway Pundit specifically appear in the tracking spreadsheet that CISA uses, that the FBI uses as well. And we also know that the EIP, the Election Integrity Partnership that works with CISA and the district court found this a million times and said it looks like they have a coordinated effort out to get Jim Hoft. I mean, I think that's our second best example on direct traceability, Your Honor. So if you're not satisfied with Jill Hines, look at Jim Hoft. Look at page 20 of the red brief. Thank you. Justice Gorsuch, you've spoken with Justice Kagan about your best examples on traceability. How about redressability, given that by the time the PI came around, we're in 23? Your Honor, so we had two second supplemental declarations that are at the end of the joint appendix that are from Jim Hoft and from Jill Hines that identify the specific posts that they have posted on Twitter and Facebook during the pending preliminary injunction proceedings. One of the ones we talked about was JA 793 and 794, which is the Jill Hines Facebook post referencing RFK, referencing Tucker Carlson, referencing vaccines, it's turtles all the way down. And that is an example, and all of these are examples of injuries that post-date a lot of the earlier filings in this case. And so, you know, when we talk about traceability, Your Honor, this injunction is an order to the government not to continue engaging in the sorts of censorship that led to these kinds of censorship decisions. I'd like to talk just briefly about remedy. This is another example of a universal injunction. And the district court enjoined behavior by platforms that your clients didn't use and enjoined actions with respect to non-parties not affecting your clients. We've seen an epidemic of these lately. What do we do about it? So a couple of responses to that, Justice Gorsuch. I think one reason the breadth of the injunction is what it is, is what the circuit explained at JA 8183, which is the breadth of the government's enterprise in this case was extremely broad. When it's identifying, I had this call with Justice Kagan about whether you can identify them calling out to Joe Heinz specifically. The reason it's hard for me to do that is because they weren't cutting at that level in the weeds. What they were taking is broader strokes like vaccines are safe for children, calling that claim true, and then having the platforms go out and censor contrary claims. And so the reason you see the breadth of the injunction being the way it is, Your Honor, it's a product of what the government did. Now, if you have concern— Every universal injunction case, but your clients are your clients. They're the only ones complaining. And it's their case, it's their controversy, and normally our remedies are tailored to those who are actually complaining before us and not to those who aren't. Right? Your Honor, and if you have that concern, we're completely fine. If you want to limit the injunction to the five platforms as to which we were able to get preliminary discovery, that's completely fine with us. If you want to limit just to the seven plaintiffs, also completely fine, Your Honor. I think the most important takeaway in this case is that the court has to say something in our favor on the merits. The government can't just run rampant pressuring platforms to censor private speech. Justice Kavanaugh? On Bantam Books, I read that to refer to coercion and not to significant encouragement. I think that's right, Your Honor. Although if you look at page 66 to 67, this court used the term coercion alongside the term persuasion. And intimidation. I mean, I think there is some flexibility in those terms. You can imagine a world in which you could call persuasion another variety of encouragement. As I say, I'm not wedded to any label. We're not wedded to any label. But I do agree that the word encouragement doesn't appear in Bantam Books, Your Honor. And one thing that I think I want to square up with you is if someone calls and contacts the social media company and says, what you have there, this post has factually erroneous information. So not a viewpoint that we disagree with. Factually erroneous information. And the social media company says, well, take a look at that. And you still think that's significant encouragement that qualifies as coercion if they take it down in response to concluding that in fact is factually erroneous? No, Your Honor. If there's no ask from the government, if the government is just saying, here's our view of the statement. OK. And we think it shouldn't be. It should be taken down. It's up to you, but we think it should be taken down. Yeah, I think that's a harder case for me. I guess, you know, if you think it's a close case, decide in favor of the First Amendment. What's... That's the question here. You can't just claim the mantle. Yeah. What do you think the... When you say it's a harder case, why do you think it's a harder case? Because I understand the instinct, Your Honor, that just asking very, very politely or just saying very, very politely, we think you should take it down, that that shouldn't be a First Amendment problem. But the reality is that when somebody like the FBI or somebody like a deputy assistant to the president makes a statement like that, that statement carries force. That's just the reality. My dear mother is a saint, and if she makes the same statement to Twitter, they don't know from Adam, they don't care, but they do care if it's the government. Why is that? Is it your assumption that anyone in those circumstances is always implicitly threatening adverse consequences? No, Your Honor. And this is where Bantam Books, I think, is good for us because it says you look through the forms to the substance. And so you look at the substance of the communication and say, well, is what the government doing here, is it trying to effectively suppress a third party speech? And so if the forms cut one way, but the substance cuts the other way... The hypo was about factually inaccurate. Right. Factually inaccurate information. And if the government says our view of that is that it's false, they can absolutely say that. But if they do more and they say, you need to take this down. You should take it down. You should take it down. That's a problem. First Amendment issue, Your Honor. I'm actually inaccurate about something the troops are doing, US troops are doing. You should take that down. It's factually inaccurate. It's harming the war effort. It's not accurate. And you're just running post after post describing what's going on in an inaccurate way. And it's up to you. But why should you be publishing that inaccurate information? And the North Star for the government in that situation is more speech. Publish the true speech that they think should counter what they view as false speech. The government is not helpless here. It has tools at its disposal and censorship has never been the default remedy for a perceived First Amendment violation. What do you do with the fact that the platforms say no all the time to the government? Your Honor, it doesn't matter. I think Judge Posner made this point in Backpage versus Dart, which is you could have a threatener who threatens a recipient. The recipient says no. And so the threatener packs their tent and walks away. That's still a First Amendment violation, even though the recipient refused to comply. Thank you. Justice Barrett. Picking up on Justice Kavanaugh's question about what makes something threatening and is it just something inherent in the nature of a person, the person on the other end of the line being a government official. So Benton Books points out that the speech, the threat, the encouragement, if that's what we can posit for this purpose, comes from someone with the authority to impose a sanction. Is that important in your view? Your Honor, it isn't. We think it's a relevant fact that if somebody like an FBI agent that is meeting regularly with the platforms is making these kinds of requests, that that's a fact that you have to take into consideration. Justice Sotomayor has a panel, interim panel decision called Aquetti v. Molinari in the Second Circuit that addressed this issue about authority. And the issue in that case was that the borough president of Staten Island didn't have authority to take down a particular billboard, but the court still said that the fact that the recipient thought that the borough president might be able to use whatever authority he did have to cause trouble for the billboard owner, that was enough. So if the speaker has that kind of authority, Your Honor, I think that's a critical fact that you have to take into account because as I say, if it's somebody that Twitter doesn't know from Adam that's making the request, they're just going to ignore it. Well, I mean, if it's a staff or even if it's somebody on the Hill, I mean, you know, people who work on the Hill don't have control over DOJ or if it's a staffer in the White House, you know, mentioning 230 or maybe that's what's in the platform's mind, but, you know, no authority to bring an antitrust suit or to try to change 230 or advocate for 230 changes, that doesn't matter? Your Honor, I mean, what I would say is on the facts of this case, if you have the deputy assistant to the president making that kind of statement, sure, he can't make that. He can't change. Let's say it's low-level, not deputy assistant to the president. Let's just call it somebody low-level staffer. Two people below him, two people below him, they can't unilaterally reform 230 or promulgate rulemakings, but they can engage in a process that itself is punishment, basically. I mean, imagine being on the receiving ends of Rob Clarity for six months on end, and he's receiving these kinds of emails. In some ways, it's the adverse consequences that were threatened and that were actually carried out. So we should focus less on authority, or authority can kind of drop out. The point is, if it comes from the government, and so there might be some conceivable way in which the government could follow through in some sort of punitive way, that's the relevant inquiry. Your Honor, I think that is certainly one way you can look at the analysis. Absolutely. Okay, thanks. Justice Jackson? So my biggest concern is that your view has the First Amendment hamstringing the government in significant ways in the most important time periods. I mean, what would you have the government do? I've heard you say a couple times that the government can post its own speech, but in my hypothetical, you know, kids, this is not safe, don't do it, is not going to get it done. And so I guess some might say that the government actually has a duty to take steps to protect the citizens of this country, and you seem to be suggesting that that duty cannot manifest itself in the government encouraging or even pressuring platforms to take down harmful information. So can you help me? Because I'm really worried about that, because you've got the First Amendment operating in an environment of threatening circumstances from the government's perspective, and you're saying that the government can't interact with the source of those problems. And your honor, I understand that and see, and I guess what I tell you is our position is not that the government can't interact with the platforms there. They can and they should in certain circumstances like that that present such dangerous issues for society and especially young people. But the way they do that has to be in compliance with the First Amendment. And I think that means they can give them all the true information that the platform needs and ask to amplify that. Right. You're just you're just saying that. I guess I thought when you say the way they do, that is consistent with the First Amendment, is that they have to show that they have a compelling interest to do what they're doing. In other words, you you want us to take the line to be between compulsion and encouragement. And what we're looking at is the government can't compel. Maybe they can encourage. I'm wondering whether that's not really the line. The line is it does the government pursuant to the First Amendment have a compelling interest in doing things that result in restricting the speech in this way. That test, I think, takes into account all of these different circumstances that we don't really care as much about how much the government is compelling, or maybe we do. But in the context of tailoring and not as sort of a freestanding inquiry that's overlaid on all of this. Does that make sense? It does, Your Honor. And I apologize for missing your guidance earlier. So the way I think about that is I've been discussing the standard and I thought we've all been discussing the standard on the front end of the analysis, which is, is there a First Amendment violation? Is there an abridgment of speech? I guess I would conceptually think of strict scrutiny, narrow tailoring, compelling interest as coming in at the back end to say, yes, maybe in the ordinary case, the government shouldn't have been permitted to undertake the kind of suppression of free speech that it did. But in this unique circumstance, it actually had a compelling interest and it used narrowly tailored means to accomplish that interest. I mean, I think that's the fail-safe. If you're concerned with the breadth of our arguments, that's one fail-safe, which is no matter how broad the standard the court adopts, there's always going to be strict scrutiny at the end of the line to save the government in times where it desperately needs to do the things that you're outlining. Thank you. Thank you, Counsel. Rebuttal, Mr. Fletcher. Thank you, Mr. Chief Justice. I'd like to start with a few points on standing and then address the merits and then try to step back and talk about the bigger picture. So first on standing, I have to start with a clarification about Joe Heinz's emails at pages 793 to 794 of the Joint Appendix. I had misunderstood the cross-posting issue that my friend alluded to earlier. I thought that was a moderation event by Twitter, not by Facebook. I appreciate his clarification. And because we've been insistent on the lower courts turning square corners on the facts here, I wanted to make sure I did that too. I don't think that changes the fundamental point, though, because we're still talking about an act of moderation in April 2023, years after the last White House or any government speech targeting Mr. Kennedy's content, which happened back in 2021. And that, Justice Kagan, I think points out the problem that you highlighted, which is that they're trying to draw the connection between the government's acts here and the moderation that harmed them through timing, and the timing just isn't very good. And so I want to talk about the two best examples that he gave you, the one being Ms. Heinz's groups on Facebook. And this is discussed at page 630 of the Joint Appendix. Justice Kagan, you pointed out that her groups were moderated at least two and four months after the relevant exchange between Facebook and the government. But it's actually worse than that. The May 2021 email from Facebook to the government says, we've already taken action on health groups to remove them from our recommendation feature. It wasn't reporting on something it would do in the future. It was reporting on something it was already done. And it's not even clear from the email that Facebook was doing that because of any requests from the government. It was a report of its own action. And then his next best example is Mr. Host and the appearance of Mr. Host on a spreadsheet that the Department of Homeland Security's CISA sub-agency maintains. This appears at record on appeal 17,016. And the problem with that is twofold. First, this is a tracking spreadsheet that monitors information sent from election officials to the platforms. This shows that the report was made by the Election Integrity Partnership, a private entity. It wasn't a referral that was made by CISA, the federal agency. CISA was just noting the existence of the referral. And second, as far as I'm aware, there's no indication in the record that the referenced piece of content was actually taken down at all. So I think that points up that what they just haven't shown is any injury traceable to the government, let alone an imminent risk of future injury. Second, on the merits, I think it's instructive to start with what my friend called one of the hottest documents. This is record on appeal 15,322, the email exchange between Surgeon General Murphy and someone at Facebook. Because this is coming in that critical July 2021 period. And what starts that email exchange is not any concern about the private email exchanges, the stuff that happened behind closed doors, antitrust reforms, Section 230. It's the Facebook reaching out and saying we wanted to get in touch because of the president's statements about us, the reference to killing people, and because of the Surgeon General's health advisory on what platforms could be doing to be doing more along with others in society. And I think what that highlights is that to the extent that the government had influence on the platforms here, and we acknowledge there are indications that it did, it's influence of the classic bully pulpit sort. President Reagan condemning pornography, or excuse me, President Bush condemning pornography. President Reagan condemning media about drugs and violence. Teddy Roosevelt condemning muck rappers. Part of our constitutional tradition is that presidents and their close advisors have the ability, the authority to, in a non-coercive way, speak their mind and call on the public to act. And we think that's what was happening here. And finally, if I could just step back and, you know, my friend started by saying that this is a massive attack on free speech. The lower courts called it a coordinated censorship campaign. I want to be clear, if those things had happened, they would be reprehensible. It would be a huge problem. But we would think that before validating those sorts of charges against senior government officials and career employees spanning two different administrations, the lower courts would insist on a rigorous analysis of the facts and the law. And with all respect to the lower courts, we don't think that's happened here. We don't think that's supported. We think the easiest way for this court to resolve this case is on standing, on the lack of forward-looking injury ground, Justice Kagan, that you and I discussed earlier. But to the extent that the court does get to the merits, we urge you to make clear that government officials do not violate the First Amendment when they flag false information or malign foreign actors, when they answer questions about public health advice, or when they speak to the public on matters of public concern, the way the president and the surgeon general did. The First Amendment is a critical bulwark against government coercion, and that's important. But it is also important that Article III courts stay within the bounds of Article III and don't enjoin or chill legitimate and productive interactions between the government and the public. We ask you to reverse. Thank you. Thank you, counsel. The case is submitted.